No. 25-30264

# United States Court of Appeals
### *for the*
# Fifth Circuit

JOHN MCLEMORE, INDIVIDUALLY & ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; CHRISTINE GLAUBER, LEAD PLAINTIFF,

*Plaintiffs-Appellants,*

*v.*

LUMEN TECHNOLOGIES, INC., FORMERLY KNOWN AS CENTURYLINK INC.; KATE JOHNSON; CHRIS STANSBURY; JEFFREY K. STOREY; INDRANEEL DEV;

*Defendants-Appellees,*

On Appeal from the United States District Court, Western District of Louisiana, Monroe Division, Case No. 3:23-cv-1290 (The Honorable Terry A. Doughty)

## BRIEF FOR PLAINTIFFS-APPELLANTS

Justin D. D'Aloia
Jeremy A. Lieberman
Guy Yedwab
POMERANTZ LLP
600 Third Avenue
New York, New York
(212) 661-1100
jdaloia@pomlaw.com
jalieberman@pomlaw.com
gyedwab@pomlaw.com

Brian Schall
THE SCHALL LAW FIRM
2049 Century Park East
Los Angeles, California 90067
(424) 303-1964
brian@schallfirm.com

Eric J. O'Bell
O'BELL LAW FIRM, LLC
3500 North Hullen Street
Metairie, Louisiana  70002
(504) 456-8677
ejo@obelllawfirm.com

*Attorneys for Plaintiffs-Appellants*

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    **Plaintiffs-Appellants**: Christine Glauber, John McLemore

2.    **The Putative Class**: All persons and entities other than Defendants that purchased or otherwise acquired securities issued by Lumen Technologies, Inc. between November 8, 2018, and October 31, 2023, both dates inclusive

3.    **Defendants-Appellees**: Lumen Technologies, Inc., Kate Johnson, Chris Stansbury, Jeffrey K. Storey, Indraneel Dev

4.    **Counsel for Plaintiffs-Appellants**: Pomerantz LLP, The Schall Law Firm, O'Bell Law Firm, LLC

5.    **Counsel for Defendants-Appellees**: Allen Overy Shearman Sterling US LLP, Kean Miller LLP

By:

/s/ *Justin D'Aloia*
Justin D'Aloia

*Attorney of Record for Plaintiffs-Appellants*

i

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a), and Fifth Circuit Rules 28.2.3 and 34.2, Plaintiffs-Appellants respectfully request oral argument. At issue in this class action are approximately $1 billion in damages arising from five categories of misstatements over a period of nearly five years regarding the use and retirement of nationwide infrastructure covered in a heavily regulated toxic substance. Oral argument will be helpful to the Court to evaluate the complex facts, and proper inferences to draw from those facts, under the heightened pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as well its review of the improper factual findings and inferences drawn in the decision below that conflict with, or otherwise extend beyond the four corners of, the operative complaint.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

STATEMENT REGARDING ORAL ARGUMENT .............................................. ii

TABLE OF CONTENTS.................................................................................... iii

TABLE OF AUTHORITIES ...............................................................................v

JURISDICTION.................................................................................................1

ISSUES PRESENTED FOR REVIEW ...............................................................1

STATEMENT OF THE CASE.............................................................................2

I.      FACTS ...................................................................................................2

        A.      Lumen and Its Legacy Network of Copper Cables..............................2

        B.      Lead Is a Heavily Regulated Highly Toxic Material ............................3

        C.      Lumen Chose to Abandon the Sprawl of Lead-Covered Copper
                Cables in Its Legacy Network as It Transitioned to Fiber ...................5

        D.      Lumen Misled Investors About Its Legacy Practices as It Touted Its
                Decision to Transition to Fiber and Evolve Into a New Company.......7

        E.      Investors Suffer Losses as the Truth Emerges .....................................9

II.     PROCEDURAL HISTORY .........................................................................10

SUMMARY OF ARGUMENT .............................................................................13

STANDARD OF REVIEW ..................................................................................16

ARGUMENT ......................................................................................................16

I.      LEGAL STANDARDS ................................................................................16

        A.      Motion to Dismiss ...............................................................................16

        B.      Substantive Claims ..............................................................................17

        C.      Leave to Amend ...................................................................................18

II.     THE DISTRICT COURT ERRED BY RULING THAT PLAINTIFFS
        FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT ...................19

        A.      The Representations Concerning the Cost Benefits of Transitioning
                from Copper to Fiber Were False and Misleading...............................20

B. The Representations Concerning Lumen's Environmental Stewardship Were False and Misleading ............................................26

C. The Representations Concerning Employee Safety Were False and Misleading .................................................................................32

D. The Representations Concerning GAAP Compliance Were False and Misleading .........................................................................34

E. The Representations Concerning EHS Contingencies Were False and Misleading .................................................................................35

III. THE DISTRICT COURT ERRONEOUSLY HELD THAT THE FAC FAILED TO RAISE A STRONG INFERENCE OF SCIENTER ...............38

A. The EHS Risk Disclosures Are Not Unattributed ...............................39

B. The FAC Raises a Strong Inference of Scienter for Each of the Individual Defendants ........................................................................40

1. The District Court Improperly Disregarded an Array of Individualized Facts from Which to Infer Scienter .................40

2. The Core Importance of Lumen's Copper Network Supports an Inference of Scienter ................................................................43

3. Defendants Were Highly Motivated to Hide the Fraud ...........45

C. The FAC Raises a Strong Inference of Scienter for Lumen ..............47

D. Viewed Holistically, the Inference of Scienter Is Overwhelming ......48

IV. THE DISTRICT COURT IMPROPERLY HELD LOSS CAUSATION WAS NOT ADEQUATELY PLED FOR SEVERAL MISSTATEMENTS ................................................................................49

V. THE DISTRICT COURT INCORRECTLY DISMISSED PLAINTIFFS' CONTROL PERSON CLAIM ...................................................................52

VI. PLAINTIFFS SHOULD BE PERMITTED TO AMEND ...........................52

CONCLUSION ................................................................................................55

CERTIFICATE OF SERVICE .........................................................................57

CERTIFICATE OF COMPLIANCE .................................................................59

iv

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ........................................................50, 51

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)...........................................................18, 38

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ................................................................37

*Assoc. of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of
   Internal Med.*,
   103 F.4th 383 (5th Cir. 2024) .................................................19, 54, 55

*In re AT&T Sec. Litig.*,
   2025 WL 1685840 (N.D. Tex. June 16, 2025) ..................................26

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).....................................................................30, 48

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................17

*BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................32

*Blum v. AT&T Corp.*,
   No. 6:23-cv-01748 (W.D. La.) ...........................................................47

*In re BP p.l.c. Sec. Litig.*,
   843 F. Supp. 2d 712 (S.D. Tex. 2012)................................................34

*In re BP p.l.c. Sec. Litig.*,
   2016 WL 3090779 (S.D. Tex. May 31, 2016)....................................30

*Carlton v. Cannon*,
   184 F. Supp. 3d 428 (S.D. Tex. 2016)................................................31

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) .........................................................31

*In re Concho Res. Inc. Sec. Litig.*,
   2023 WL 2297425 (S.D. Tex. Feb. 23, 2023) ..............................................37, 45

*Dura Pharms. Inc. v. Broudo*,
   544 U.S. 336 (2005)..................................................................................18, 50

*Eminence Cap., LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ..........................................................................55

*Foman v. Davis*,
   371 U.S. 178 (1962)..........................................................................................55

*George v. SI Grp., Inc.*,
   35 F.4th 611 (5th Cir. 2022) .............................................................................17

*Godinez v. Alere Inc.*,
   272 F. Supp. 3d 201 (D. Mass. 2017)................................................................35

*Goldstein v. MCI WorldCom*,
   340 F.3d 238 (5th Cir. 2003) .....................................................................35, 40

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
   313 F.3d 305 (5th Cir. 2002) ............................................................................53

*Greenberg v. Crossroads Sys., Inc.*,
   364 F.3d 657 (5th Cir. 2004) ............................................................................12

*Hall v. Rent-A-Center, Inc.*,
   2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) ..................................................46

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015)............................................................................37

*Hart v. Bayer Corp.*,
   199 F.3d 239 (5th Cir. 2000) ............................................................................54

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) .....................................................................17, 18

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008) .............................................................20, 25, 41

*Isquith v. Middle S. Util., Inc.*,
  847 F.2d 186 (5th Cir. 1988) ...............................................................29

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022) ................................................34

*Kohut v. KBR, Inc.*,
  2015 WL 11995250 (S.D. Tex. Sept. 3, 2015)....................................42

*Leal v. McHugh*,
  731 F.3d 405 (5th Cir. 2013) ...............................................................17

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  283 F.3d 363 (5th Cir. 2001) ...............................................................52

*Lormand v. US Unwired Inc.*,
  565 F.3d 228 (5th Cir. 2009) .......................................................*passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024).............................................................................19

*Masel v. Villarreal*,
  924 F.3d 734 (5th Cir. 2019) ...............................................................42

*N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*,
  898 F.3d 461 (5th Cir. 2018) .........................................................19, 55

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 410 (5th Cir. 2001) ...................................................40, 45

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) ...............................................................46

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) .......................................................*passim*

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..........................................................19, 20, 25, 29

*Piambo v. Bailey*,
  610 F.2d 1306 (5th Cir. 1980) .............................................................25

*In re Pilgrim's Pride Corp. Sec. Litig.*,
    2010 WL 3257369 (E.D. Tex. Aug. 17, 2010) ....................................................55

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ................................................................49

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
    777 F. App'x 726 (5th Cir. 2019) ........................................................20

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ........................................17, 50, 51, 52

*Rawson v. ALDI, Inc.*,
    2022 WL 1556395 (N.D. Ill. May 17, 2022)......................................31

*Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019) ................................................................38

*Ret. Sys. v. Energy Transfer LP*,
    532 F. Supp. 3d 189 (E.D. Pa. 2021)..................................................34

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ................................................................37

*Salzman v. ImmunityBio, Inc.*,
    2024 WL 3100274 (S.D. Cal. June 20, 2024) ..................................29

*SEC v. World Tree Fin., LLC*,
    43 F.4th 448 (5th Cir. 2022) ................................................................30

*Set Capital LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) ..................................................................43

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ................................................................37

*In re Sioux, Ltd. Sec. Litig.*,
    914 F.2d 61 (5th Cir. 1990) ................................................................31

*Smallen v. W. Union Co.*,
    950 F.3d 1297 (10th Cir. 2020) ..........................................................43

*In re SolarWinds Corp. Sec. Litig.*,
  595 F. Supp. 3d 573 (W.D. Tex. 2022) ..................................................32, 34, 35

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ........................................................30, 48

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ...........................................38, 39, 45, 46

*Spivey v. Chitimacha Tribe of La.*,
  79 F.4th 444 (5th Cir. 2023) ...................................................16

*Stripling v. Jordan Production Co.*,
  234 F.3d 863 (5th Cir. 2000) ........................................................16, 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................39

*Vardeman v. City of Houston*,
  55 F.4th 1045 (5th Cir. 2022) ...................................................17

*In re Venator Materials PLC Sec. Litig.*,
  547 F. Supp. 3d 624 (S.D. Tex. 2021) ................................................43

*Yoshikawa v. Exxon Mobil Corp.*,
  2022 WL 4677621 (N.D. Tex. Sept. 29, 2022) ................................................24

**Statutes**

15 U.S.C. § 78aa(a) ........................................................1

15 U.S.C. § 78j(b) ........................................................*passim*

15 U.S.C. § 78t(a) ........................................................*passim*

15 U.S.C. § 78u-4........................................................18, 39

18 U.S.C. § 1350(b) ........................................................40

28 U.S.C. § 1291 ........................................................1

28 U.S.C. § 1331 ........................................................1

Resource Conservation and Recovery Act ........................................................*passim*

Sarbanes-Oxley Act of 2002 ........................................................................40

**Rules**

Fed. R. Civ. P. 8 ..................................................................................2, 50

Fed. R. Civ. P. 9 .......................................................................................54

Fed. R. Civ. P. 15 ...............................................................................16, 19

Fed. R. Civ. P. 12 ...............................................................................16, 17

**Other Authorities**

17 C.F.R. § 229.105(a).............................................................................32

17 C.F.R. § 240.10b-5.......................................................................*passim*

40 C.F.R. § 268.34 .....................................................................................6

45 Fed. Reg. 33084 (May 19, 1980) .........................................................5

## JURISDICTION

This case arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), codified at 17 C.F.R. § 240.10b-5. The district court had jurisdiction under 15 U.S.C. § 78aa(a) and 28 U.S.C. § 1331.

On March 31, 2025, the district court entered a final Judgement dismissing all claims asserted in the First Amended Class Action Complaint ("FAC"). ROA.2599. Lead Plaintiff Christine Glauber ("Lead Plaintiff") and additional Plaintiff John McLemore (together with Lead Plaintiff, "Plaintiffs") filed a timely notice of appeal on April 30, 2025. ROA.2600-01. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Did the district court err in deciding that Plaintiffs failed to state a claim under Section 10(b) of the Exchange Act as a matter of law by failing to accept the facts alleged as true and, instead, grounding its ruling in several heavily contested factual findings and inferences contradicted by the facts alleged?

2.    Did the FAC adequately allege that any of the representations made by Defendants were either materially false or half-truths that omitted material facts which made them misleading to a reasonable investor?

1

3. Did the FAC adequately allege facts from which to infer that Defendants knew information suggesting that their public statements were false or misleading?

4. Did the FAC adequately allege that two discrete groups of misstatements caused Plaintiffs' losses in accordance with the notice pleading standard of Fed. R. Civ. P. 8(a)?

5. Did the district court err in dismissing Plaintiffs' claim for secondary liability under Section 20(a) of the Exchange Act because the FAC does not adequately allege a "primary violation" under Section 10(b) of the Exchange Act?

6. Did the district court exceed its limited discretion when it dismissed Plaintiffs' claims with prejudice, without providing any explanation, given that the claims were dismissed for failing to satisfy the heightened pleading requirements of the PSLRA, Plaintiffs never had a previous opportunity to cure such deficiencies, Plaintiffs requested that they have an opportunity to replead, and explained how an amended pleading could cure the defects specified by the district court?

## STATEMENT OF THE CASE

## I. FACTS

### A. Lumen and Its Legacy Network of Copper Cables

Previously known as CenturyLink, Lumen Technologies, Inc. ("Lumen") is a large telecommunications company headquartered in Monroe, Louisiana. ROA.464

¶32.  Unlike competitors AT&T and Verizon, Lumen historically focused almost exclusively on services delivered through old copper telephone cables, as opposed to wireless or cellular technology, and grew to become the third largest cable-based telecom company in the United States by acquiring other major wireline providers or their assets, including several formed in connection with the federal government's breakup of the Bell System in 1984.  ROA.464-67 ¶¶32-41.

By the start of the Class Period in 2018, Lumen was in the early stages of building a new network of fiber optic cables, but it still owned a vast network of "legacy" copper cables across the United States.  ROA.468-69 ¶¶46-47.  In October 2022, Lumen sold almost 400,000 miles of its legacy assets in 20 states to a startup called Brightspeed.  ROA.470-71 ¶¶49-50.  Even so, Lumen still owned approximately *700,000 miles* of copper cable after the sale.  ROA.495 ¶111.

### B.   Lead Is a Heavily Regulated Highly Toxic Material

Lead is a brittle heavy metal that can release unnoticeable particles on contact.  ROA.472 ¶¶56, ROA.473 ¶59.  In this form, lead is a potent neurotoxin that can cause catastrophic—even fatal—damage to every major body system, especially in children.  ROA.475 ¶63.  Because it accumulates in the body over time and may go undetected for years, lead has earned the nickname the "silent killer."  ROA.474 ¶61, ROA.475 ¶64.  There is near-universal consensus by medical authorities around the world that there is no safe level of lead in the human body.  ROA.482 ¶76.

Due to its unique physical properties, lead was used ubiquitously until its dangers became better understood in the mid-twentieth century. ROA.473 ¶58, ROA.476 ¶66. Since the 1970s, the federal government has taken a series of well-known steps to protect the public from lead and eradicate its continued use, including its ban on lead in residential paint, gasoline, and pipes used in public water systems. ROA.476-77 ¶¶67-68, ROA.479-80 ¶72, ROA.481 ¶75. Through these measures, the dangers of lead have become widespread public knowledge. ROA.482 ¶76.

Still, there is a significant amount of lead remaining in certain industries. ROA.482-83 ¶77. As such, the Occupational Safety and Health Administration ("OSHA") has promulgated stringent occupational safety standards for workers who handle lead. ROA.483-85 ¶¶78-82. The rules are technical but necessary: occupational exposure is one of the leading causes of lead poisoning. ROA.483 ¶77.

For similar reasons, lead is subject to several laws governing the handling of hazardous waste, including the Resource Conservation and Recovery Act ("RCRA"). ROA.487 ¶88. Lead is subject to the RCRA because the Environmental Protection Agency ("EPA") has classified it as a "toxic" waste, a type of waste that "may be able to leach from waste and pollute groundwater." ROA.487-88 ¶89. It has been assigned EPA toxic waste number D008. ROA.523 ¶176. Other forms of toxic waste include arsenic and mercury. ROA.488 ¶89. Indeed, lead has been classified as a toxic waste since the inception of that list in 1980. *See* 45 Fed. Reg.

33084, 33122 (May 19, 1980). The EPA also has broad power under its "Superfund" law, known as CERCLA, to investigate and order the cleanup of any toxic waste that is released into the environment, including lead. ROA.488-89 ¶91.

### C. Lumen Chose to Abandon the Sprawl of Lead-Covered Copper Cables in Its Legacy Network as It Transitioned to Fiber

Until it was phased out in the 1950s, lead was the industry-standard protective cover, or "sheathing," for copper telephone cables and used extensively as such by the companies that built the nation's telephone network. ROA.490 ¶¶95-96, ROA.491-92 ¶¶99-102. Lumen added lead-covered cables to its network by acquiring wireline assets from companies created by the breakup of the Bell System in 1984 or otherwise owning companies that operated before lead was phased out. ROA.491 ¶98, ROA.493 ¶105.

Prior to the Class Period, Lumen's revenues primarily derived from services that relied on this network of old copper cables, like local and long-distance calling and DSL internet access. ROA.466-67 ¶40, ROA.468 ¶45. But its revenues were progressively declining as demand for those legacy services subsided with the proliferation of new high-speed alternatives. ROA.467 ¶40.

On November 1, 2017, Lumen completed a strategic $34 billion transaction to acquire a leading provider of fiber optic services to business, or "enterprise," clients. ROA.467 ¶41. Storey and Dev soon decided to exit the market for legacy services on the consumer side as well. On November 8, 2018, the first day of the

Class Period, Storey announced a new strategy for Lumen, which involved winding down its copper-based services and becoming a leading provider of fiber services as part of an ongoing "digital transformation." ROA.498 ¶115. A key "pillar" of this strategy was taking costs out of the legacy business and managing it for cash as Lumen invested heavily in fiber. ROA.598 ¶382. This decision was based on a detailed examination of Lumen's legacy portfolio by Storey and Dev. ROA.606 ¶408.

As Lumen transitioned to fiber, many parts of its legacy network became obsolete, including the aged parts covered in lead. ROA.498 ¶116. Given its designation as a toxic waste, lead that no longer served a useful purpose had to be disposed in accordance with the RCRA's strict standards, which prohibit land disposal. ROA.580 ¶339, ROA.593-94 ¶373; *see also* 40 C.F.R. § 268.34.

In fact, Lumen understood from past practice that (i) lead is a regulated waste subject to the RCRA's specialized protocols; and (ii) extremely toxic. For years, it reported lead generated in other operations to the EPA under the RCRA's reporting requirements using the EPA-specific toxic waste number "D008." ROA.523-25 ¶¶174-81. Lumen also agreed to establish a nationwide "lead abatement" program after an OSHA investigation in 2013 found that its frontline workers who came in contact with lead cables were exposed to excessive levels of lead and regularly violated the OSHA lead standard. ROA.510-18 ¶¶145-63.

Nevertheless, Lumen chose to simply abandon its unwanted lead cables across the country as they were displaced by fiber. ROA.498-500 ¶¶115-23. The decision was purely financial. Removing this highly regulated infrastructure is doable but exceedingly expensive. ROA.598-99 ¶¶383-87. Accordingly, as it invested heavily in fiber, Lumen chose to simply leave this toxic hardware behind because it cost more to remove it than could be made reselling it. ROA.499 ¶118, ROA.500 ¶123.

By the end of the Class Period, there was still some *35,000 miles* of lead sheathing in Lumen's nationwide network of copper cables. ROA.495 ¶111. That is almost enough to wrap around the Earth one and a half times. ROA.495-96 ¶111. Frontline workers tasked with maintaining this network frequently encountered lead cables throughout the areas where Lumen operates, especially the oldest parts of its network in densely populated cities, including Denver, Las Vegas, Minneapolis, Portland, Seattle, and elsewhere. ROA.493-95 ¶¶107-09. This toxic hardware sits in piles in underground vaults, hangs on utility poles overhead, and runs directly into residential buildings. ROA.493-95 ¶¶107-09.

### D.     Lumen Misled Investors About Its Legacy Practices as It Touted Its Decision to Transition to Fiber and Evolve Into a New Company

Rather than inform investors about the risky decision to indefinitely leave its toxic cables scattered across the country, Defendants touted the benefits of the shift to fiber and its sustainability practices. For example, Defendants regularly spoke about Lumen's "digital transformation" program throughout the Class Period as

Lumen invested heavily in fiber. Call after call, they told investors that converting from copper to fiber yielded substantial cost savings. ROA.558-67 ¶¶260-83.

Separately, Lumen's history as a mainstay of the copper market did not align with its "digital transformation" strategy and the Company soon began to enhance its public image. As such, in mid-2019, Lumen enhanced its sustainability reports to provide more robust disclosures on its corporate citizenship and environmental, social, and governance ("ESG") initiatives. ROA.472 ¶54. Therein, Lumen represented that it was "actively making choices to lessen [its] environmental impact," and had programs in place to "ensure the appropriate disposition of hazardous waste." ROA.572-79 ¶¶305-35. It even specified that it "recycles telecommunications equipment," including "copper wire," as one might expect from a sustainably-minded company sunsetting its copper network. ROA.572-79 ¶¶305-35. Lumen also repeatedly touted its commitment to providing a workplace "free" from hazards, representing that it regular reviewed "safety performance" to identify areas for improvement. ROA.567-571 ¶¶284-304.

None of these disclosures informed investors that Lumen chose to dispose of vast quantities of highly toxic material known to leach into the environment by simply abandoning it across the country, contrary to the RCRA. ROA.598 ¶383. Worse still, frontline workers who handled the lead remaining in Lumen's legacy network confirmed that there were no controls in place to verify adherence to any

standards, much less evaluate their performance, and, as such, there continued to be rampant noncompliance with the OSHA lead standard, exposing Lumen's workforce and the communities where they work to lead poisoning.  ROA.496-98 ¶¶113-14

### E.    Investors Suffer Losses as the Truth Emerges

In July 2023, *The Wall Street Journal* ("*WSJ*") published a series of stories on lead telecom cables based on an 18-month investigation into the matter.  ROA.532-43 ¶¶202-21.  The investigation uncovered thousands of miles of lead-sheathed cables lining the country, next to homes, playgrounds, and parks; environmental contamination exceeding permissible EPA lead standards, especially near those not in conduit; and extensive evidence showing that the large telecommunication companies, including Lumen, were fully aware of the environmental and human health risks posed by these cables.  ROA.537-41 ¶218, ROA.542-43 ¶220.

News of these cables took everyone by surprise, even veteran industry experts. Senior telecom analysts said they "never" encountered the topic before.  ROA.541 ¶219.  Four former chairs of the Federal Communications Commission ("FCC"), the nation's wireline regulator, said they were unaware of lead cables.  ROA.541 ¶219. Indeed, the *WSJ* launched its investigation—and committed a year and a half of resources—because the reporter who first learned of the issue "never heard of lead cables in the telecom networks."  ROA.533 ¶204.  The *WSJ* itself even observed that "the lead-covered cables have been largely unknown to the public."  ROA.542 ¶220.

9

Lawmakers and regulators also responded with corresponding alarm. A senior Congressman deeply involved in telecommunications policy described the indifference shown by the cable owners "corporate irresponsibility of the worst kind." ROA.545 ¶227. Another called on these companies to "clean up their mess." ROA.546 ¶228. By the end of July, the Department of Justice ("DOJ") and the EPA both opened investigations into the lead cables. ROA.547 ¶231. Lumen has admitted that it is cooperating with the EPA. ROA.549 ¶237.

On August 1, 2023, Stansbury finally confirmed that Lumen had approximately *35,000* miles of lead sheathing in its network. ROA.548-49 ¶234. Later that same day, Lumen made an SEC filing that finally disclosed a "loss contingency" for the liability it could face for the "lead-sheathed cables" that it owned during the Class Period. ROA.591-92 ¶366. On October 31, 2023, Lumen also revealed that it anticipated incurring "investigative costs" as a result of the "recent media coverage" on lead cables. ROA.592 ¶368.

The market's reaction was severe: Lumen's stock price sharply declined in response to each of these disclosures. ROA.585-92 ¶¶352-69. All told, it traded down to its lowest level in over *40 years*. ROA.459 ¶13.

## II.   PROCEDURAL HISTORY

After the appointment of Lead Plaintiff, Plaintiffs filed the FAC on February 26, 2024. ROA.9-10. The FAC brought claims against Defendants under Sections

10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 thereunder on behalf of a class of all who purchased or acquired Lumen securities between November 8, 2018, and October 31, 2023 (the "Class Period"). ROA.454 ¶1, ROA.616-17 ¶¶443-50.

On April 26, 2024, Defendants moved to dismiss the FAC for failure to state a claim. ROA.10. In their moving papers, Defendants strenuously argued that the lead cables were already a matter of public knowledge and not harmful, relying on materials outside the four corners of the FAC. ROA.1890, ROA.1893-96, ROA.1897-98. Plaintiffs filed an opposition in which they stressed that Defendants arguments were negated by the facts pled, which must be accepted as true, and at best raise issues of fact that cannot be resolved on a motion to dismiss. ROA.2107-08.

On March 14, 2025, the Magistrate Judge assigned to the case issued a Report and Recommendation ("Report") recommending that Plaintiffs' claims be dismissed with prejudice. ROA.2401. Before beginning the legal analysis, the Report drew a series of highly improper findings and counterfactual inferences in an effort to frame "who knew what and when," in light of the parties' competing arguments. ROA.2437-42. First, the Court found that the public knew that telecommunication companies owned and abandoned lead cables because of two individual lawsuits against AT&T (ROA.2439), even though neither suit said anything about cables owned by anyone other than *AT&T* and the FAC alleges that the public, and industry

11

veterans, were in the dark (ROA.533 ¶204, ROA.537-41 ¶¶218-19, ROA.589-90 ¶360).  Second, the Report justified that conclusion by observing that Lumen's stock fell after the first *WSJ* article "even though the article made no mention of Lumen" (ROA.2439), contrary to the rule that "a stock's price will not change upon the release of confirmatory information, i.e., information already known to the market." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004).  Third, and not least of all, the Report surmised that Lumen had reason to believe that leaving the lead cables in place was safer than removing it, and the *WSJ*'s findings were the first time that this was called into question—which is discussed more fully in the Argument.  ROA.2439-40.  Based on these faulty and heavily disputed findings, the Report determined that Plaintiffs failed to plead that any misstatement was false or misleading or that any Defendant acted with scienter.  ROA.2442-89.

After Defendants refused to consent to a modest extension for the deadline to object to the Report, on March 20, 2025, Plaintiffs filed a motion with supporting argument to extend the deadline from 14 days to 30 days.  ROA.2503-05.  On March 21, 2025, the district court denied the motion.  ROA.15.

On the evening of Friday, March 28, 2025, Plaintiffs filed Objections to the Report (ROA.2510) ("Objections"), in which they specifically requested that any dismissal be without prejudice so they could replead (ROA.2538-39).

On March 31, 2025, less than one business day after Plaintiffs filed the Objections, and well before the deadline for Defendants to file a response, the district court entered a Judgment in which adopted the Report without modification upon consideration of "[t]he Report" and "the Objections," and conducting "a *de novo* review of the record." ROA.2599. Plaintiffs timely appealed. ROA.2600.

Because the district court adopted the Report as its own without alteration, Plaintiffs refer to the Report as the district court's ruling herein for simplicity.

## SUMMARY OF ARGUMENT

The district court failed to give Plaintiffs a fair shake. It resolved several hotly contested issues of fact in Defendants' favor, drew inferences directly contradicted by the well-pled facts, and then relied heavily on those foundational findings to conclude that Plaintiffs failed to satisfy the heightened pleading requirements of the PSLRA. Worse still, it dismissed the FAC with prejudice and closed the case even though Plaintiffs requested the opportunity to remedy those defects and had no previous occasion to do so. Evaluated properly under governing standards, Plaintiffs state a securities fraud claim or, at the very least, should be permitted to amend.

The district court first erred by concluding that Plaintiffs failed to plead that any of Defendants' statements were false or misleading. It primarily reasoned that Lumen had grounds to believe that lead cables were safe where it left them until the *WSJ* publicized its findings. But the FAC pleads facts directly to the contrary.

13

Further, what *Lumen* believed is irrelevant under controlling law, which measures whether a statement is misleading from the perspective of a reasonable investor. The FAC alleges that no reasonable investor understood Defendants' statements to mean that Lumen chose to actively discard vast amounts of highly toxic trash across the United States as a matter of standard practice. In addition, the FAC pleads a collection of facts confirming that these statements were important to investors or, at a minimum, belie the conclusion that they were immaterial as a matter of law at the pleading stage. Finally, the FAC pleads facts that contradict or undermine the accuracy of the remaining statements.

Having predetermined, as incontrovertible fact, that Lumen had "good reason" to believe that it was safe to leave its unwanted lead cables in public waterways and above busy city streets until the *WSJ* released its stories, the district court compounded its error by ruling that Plaintiffs failed to plead facts supporting a strong inference of scienter. In doing so, the district court improperly discarded an array of individualized facts supporting an inference of scienter and failed to give any weight to the remaining allegations that (1) Lumen's retirement of copper as it transitioned to fiber was a core business activity heavily scrutinized by Defendants or (2) that they were highly motivated to hide their decision to abandon thousands of miles of toxic material across the United States in a manner contrary to federal law and, thus, consider them collectively with all others. The district court also

overlooked that Lumen itself repeatedly made admissions to the federal government that independently establish scienter for its own statements.

The district court erred again when it found that Plaintiffs failed to sufficiently plead loss causation for two discrete groups of misstatements. Lumen's stock price declined in direct response to disclosures that revealed new facts, previously unknown to the market, that made the alleged fraud more likely. No more is required. The district court's insistence that the disclosure "reveal" the fraud imposes a requirement that this Court has squarely rejected and its focus on lead cables *without* lead sheathing critically misunderstands Plaintiffs' central complaint.

Because Plaintiffs state a Section 10(b) claim, the district court was also wrong to dismiss their Section 20(a) claim for failing to plead a "primary violation."

Finally, the district court improperly deprived Plaintiffs of any ability to cure its identified defects by inexplicably dismissing the case with prejudice the first and only time it passed on the sufficiency of their allegations. Its decision to do so without any explanation, when Plaintiffs can plainly plead additional facts that can remedy the deficiencies, exceeds the bounds of permissible discretion.

## STANDARD OF REVIEW

Dismissal for failure to state a claim under Rule 12(b)(6) is subject to *de novo* review. *Lormand v. US Unwired Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).[1]

The denial of leave to amend is reviewed for an abuse of the discretion afforded by Fed. R. Civ. P. 15(a). *Stripling v. Jordan Production Co.*, 234 F.3d 863, 872 (5th Cir. 2000). Accordingly, a decision to dismiss with prejudice—and, thus, deprive the aggrieved party from even *seeking* leave to amend—is reviewed for an abuse of discretion too. *Spivey v. Chitimacha Tribe of La.*, 79 F.4th 444, 446 (5th Cir. 2023).

## ARGUMENT

### I.    LEGAL STANDARDS

#### A.    Motion to Dismiss

To withstand dismissal under Rule 12(b)(6), a complaint must allege facts sufficient to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a 12(b)(6) motion, the Court is required to "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014). Accordingly, the Court must "draw *all* reasonable inferences in the

---

[1] Unless otherwise noted, all citations and internal quotations are omitted.

plaintiff's favor," *Lormand*, 565 F.3d at 232, and resolve "*[a]ll* questions of fact," if any, "in plaintiff's favor." *Vardeman v. City of Houston*, 55 F.4th 1045, 1050 (5th Cir. 2022); *see also Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) ("When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor."). This is so because 12(b)(6) motions are "viewed with disfavor," *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013), and not meant to adjudicate "the merits." *George v. SI Grp., Inc.*, 35 F.4th 611, 619 (5th Cir. 2022).

## B.     Substantive Claims

Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder prohibit fraud in connection with securities transactions. 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5. Courts have long held that investors enjoy a private right of action to enforce this rule. *See Dura Pharms. Inc. v. Broudo*, 544 U.S. 336, 341 (2005). A valid claim requires proof of: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Id.* at 341-42.

The PSLRA imposes several additional requirements for pleading a Section 10(b) claim, including that a plaintiff must (i) specify the "reasons why the statement is misleading" and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(1)-(b)(2). While the latter establishes a more stringent standard for inferring scienter at the pleading stage

(discussed *infra* Point III), the PSLRA does not disturb the foundational rule that the Court must otherwise draw "all reasonable inferences" from the facts alleged in plaintiff's favor on a motion to dismiss. *Lormand*, 565 F.3d at 239; *accord Helwig*, 251 F.3d at 553; *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002).

Section 20(a) of the Exchange Act creates liability for anyone "who, directly or indirectly, controls any person liable" under Section 10(b). 15 U.S.C. § 78t(a). Because liability under Section 20(a) is secondary, such claims require a "primary violation." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 221 (5th Cir. 2023).

## C.   Leave to Amend

Under Fed. R. Civ. P. 15(a)(2), leave to amend should be "freely" given "when justice so requires." This standard "evinces a bias in favor of granting leave to amend." *N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 477 (5th Cir. 2018); *see also Assoc. of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 394 (5th Cir. 2024) (*AAPSEF*) (emphasizing "district courts *must* entertain a presumption in favor of granting parties leave to amend"). Unless there is a "substantial reason" to deny leave, the discretion afforded by Fed. R. Civ. P. 15(a) is "not broad enough to permit denial." *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 872 (5th Cir. 2000).

## II.   THE DISTRICT COURT ERRED BY RULING THAT PLAINTIFFS FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT

Rule 10b-5 prohibits not only statements of material fact that are "untrue" on their face but also the omission of any material facts necessary to make any statements that are made "not misleading."  17 C.F.R. § 240.10b-5(b).  That is, Rule 10b-5 forbids "half-truths" that mislead by omission.  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024); *see also Six Flags*, 58 F.4th at 217 (defendants must tell the "full truth" once they choose to speak on a topic).  Thus, whether a statement is misleading "is measured not by literal truth," but its ability to "accurately inform."  *Lormand*, 565 F.3d at 248; *cf. Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187-93 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").[2]  Incomplete half-truths will mislead investors if they "create an impression of a state of affairs that differ in a material way from the one that actually exists."  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008).

---

[2] *Omnicare* addressed claims arising under Section 11 of the Securities Act of 1933.  But this Court, like many other Circuits, has applied *Omnicare* to claims arising under Section 10(b) of the Exchange Act.  *See Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019).

In the FAC, Plaintiffs alleged that Defendants issued dozens of statements during the Class Period that were materially false and misleading with respect to: (1) environmental stewardship; (2) employee health and safety; (3) the cost benefits of retiring copper-based services; (4) GAAP compliance; and (5) environmental, health and safety ("EHS") contingencies.  ROA.555-85 ¶¶253-350.  The district court determined that none of these statements were false or misleading.  ROA.2442-86.  As explained below, the district court's conclusion is unsound and must be reversed.

### A.    The Representations Concerning the Cost Benefits of Transitioning from Copper to Fiber Were False and Misleading

On investor calls throughout the Class Period, Defendants repeatedly advised that Lumen was saving substantial sums as it replaced legacy copper lines with fiber technology because it was taking the costs associated with those assets "out" of the business or otherwise managing them for optimal cost.  ROA.558-67 ¶¶260-83.  As alleged, these statements gave the impression that Lumen would not phase out its legacy services—even a small part—in a manner that would cause it to incur costly exposures.  ROA.558-67 ¶¶260-83.  Unbeknownst to investors, however, Lumen was retiring copper wires that were wrapped in lead in a manner that exposed it a host of costly risks, including legislative action, regulatory enforcement, investigation efforts, remediation, and litigation.  ROA.558-67 ¶¶260-83.

The district court incorrectly reasoned that none of these statements were false or misleading because:  (1) they either do not specifically mention copper or simply

refer to Lumen's overall copper network, rather than the 5% that is lead-sheathed; (2) they are limited to "operating," as opposed "fixed," costs; and (3) Lumen had no reason to believe that abandoning lead cables in place would give rise to any costs before the *WSJ* articles were released in July 2023. ROA.2448-62. These rulings are predicated on a series of reversible errors.

As an initial matter, none of these statements can fairly be read to *exclude* Lumen's lead-encased copper wires. Those that do not specifically refer to "copper" directly address Lumen's "legacy" systems, which are expressly pled to encompass its copper wireline network. ROA.559-61 ¶¶262-65, ROA.562-64 ¶¶271-77, ROA.565-66 ¶¶280-81. Nor do Plaintiffs improperly equate copper cables with lead-sheathed copper cables. ROA.2451, ROA.2454. Lumen's lead-covered cables are *part of* its copper network. ROA.495 ¶111. If anything, the fact that the lead cables represent approximately 5% of Lumen's copper network confirms that they are captured by these statements.

It is also incorrect to read these statements as limited to "operating" costs. For example, in the paragraph the district court used to fashion this distinction, Storey simply said that Lumen's "operational model" relies on its old copper network but then stated that transitioning away from that network can "greatly improve the cost structure" for Lumen without qualification. ROA.559-60 ¶262. This is confirmed by the fact that Storey then referred to free cash flow, which represents cash on hand

after deducting *all* costs.  ROA.559-60 ¶262.  In another, Storey was asked about "your ability to take legacy costs out," not just operating costs.  ROA.562-63 ¶271.  Dev added that Lumen's ability to "take cost out faster on the legacy platforms . . . helps in terms of how we right-size our real estate portfolio," which is a fixed cost.  ROA.563 ¶272.  Indeed, the district court acknowledged that one statement expressly refers to "legacy *fixed* costs."  ROA.2460 (citing ROA.565-66 ¶280).  Several others do not qualify the word "cost" at all.  ROA.560-61 ¶264, ROA.561-62 ¶268, ROA.563 ¶274, ROA.566 ¶282.  Properly viewed in Plaintiffs' favor on a motion to dismiss, these statements spoke broadly about the overall cost benefits of transitioning from copper to fiber.  That the district court was forced to read words into these disclosures to reach a contrary conclusion highlights its error.

Nor do Plaintiffs demand disclosure of "speculative fixed costs."  ROA.2455.  Rather, once Defendants chose to speak about the "benefits" of transitioning from copper to fiber—specifically, the cost savings—they became obligated to disclose "firm-specific adverse facts that affect the validity or plausibility of that prediction."  *Lormand*, 565 F.3d at 249; *see also Six Flags*, 58 F.4th at 217 ("[A] duty to speak the full truth arises when a defendant undertakes . . . to say anything").

In this regard, the district court's conjecture about what Lumen must have believed about the costs associated with its decision to jettison its obsolete toxic hardware is unfounded.  This conclusion expressly rests on the notion that Lumen

had "a reasonable basis to believe that the cables were safe, in place" (ROA.2450), which, in turn, summarizes the predicate finding that "there was every good reason for Lumen . . . to believe that the lead would remain contained on conduits or otherwise within a few inches of the cables." ROA.2440. That, however, fails to account for the thousands of miles of lead cable sitting on utility poles or underwater that were exposed to changing environmental conditions and lacked any containment to prevent lead particles from migrating. ROA.493-95 ¶¶107-09, ROA.496-97 ¶113.

Moreover, the only support provided for the district court's foundational finding is the *WSJ* article quoted in FAC ¶218. ROA.2440. But that article says *no such thing*. ROA.539 ¶218. Rather, it stated that some unidentified telecom executives—not anyone from Lumen—"believed it was safer at times to leave lead cables in place than remove them" on a *comparative* basis. ROA.539 ¶218. But that belief (even if attributed to Lumen) by no means compels the conclusion that vacating those cables in place—including in aerial locations near areas where people and children frequent like schools and playgrounds—was *itself* safe in isolation.

To the contrary, this finding is contradicted by the FAC's well-pled allegations. An 18-month scientific investigation found that lead was discharging from the cables. ROA.533-37 ¶¶203-217. Indeed, the very same *WSJ* article relied on by the district court reported that "[f]or many years, telecom companies have known" that "lead was potentially leaching into the environment" from the cables.

23

ROA.537-41 ¶218.  The decision to draw an unsupported conclusion contrary to these well-pled facts cannot be countenanced on a motion to dismiss.  *See Lormand*, 565 F.3d at 265 (the "district court erroneously failed to accept all of the facts alleged as true" and "draw all inferences favorable to the plaintiff" from them when it "passed over the other relevant alleged facts in silence").  Defendants may, for litigation reasons, dispute those facts—vigorously so—but "Plaintiffs need not set forth facts disproving Defendants' theories" on a motion where "the Court takes all of Plaintiffs' alleged facts as true, so long as there is a sufficiently particularized basis for their contentions."  *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *14 (N.D. Tex. Sept. 29, 2022).  The above demonstrates that there is ample basis for Plaintiffs' contentions.

More fundamentally, the district court's conjecture about what *Lumen* believed turns Rule 10b-5 on its head.  Whether a statement is misleading is assessed from the standpoint of a "reasonable investor" and, thus, an "objective" inquiry.  *Omnicare*, 575 U.S. at 186.  The Court must measure what was said against the "state of affairs that . . . actually exists" at the time *irrespective* of what any party may have believed.  *Shaw*, 537 F.3d at 541; *cf. Piambo v. Bailey*, 610 F.2d 1306, 1320 (5th Cir. 1980) (the "reasonable investor" standard does not account for "the subjective beliefs of any particular individuals").

As alleged, lead is classified as a "toxic waste" by the EPA because it is known to "leach" into surrounding materials and pose severe health hazards. ROA.487-89 ¶¶88-93. Industry experts warned that the very type of lead sheathing abandoned by Lumen did just that. ROA.504 ¶135. That the *WSJ* ultimately confirmed this through scientific testing means that those conditions also existed before those findings were made, much less published. Indeed, the *WSJ*'s investigation itself spanned 18 months. ROA.532-33 ¶202. Not least of all, Lumen's decision to simply vacate this toxic sheathing upon retirement was *inconsistent* with the way that it disposed of the others forms of lead it generated and, thus, the RCRA's strict disposal requirements for this type of regulated waste. ROA.523-25 ¶¶174-81.

These undisclosed facts were germane to the market's assessment of the claim that Lumen was eliminating costs as it moved from copper to fiber. Indeed, a Texas district court recently held that similar statements by AT&T were adequately alleged to be misleading on nearly identical allegations. *See In re AT&T Sec. Litig.*, 2025 WL 1685840, at *9 (N.D. Tex. June 16, 2025). As the court explained, "Plaintiffs plead the complete chain of inferences necessary to connect the statements about cost savings to the alleged material liability from lead-lined cables." *Id.* So too here. In fact, unlike AT&T, Lumen has since admitted that the lead cables it owned all along give rise to a risk of loss and may require it to incur various costs associated with regulatory enforcement, remediation, and litigation. ROA.591-92 ¶¶365-68.

**B.    The Representations Concerning Lumen's Environmental Stewardship Were False and Misleading**

At the outset of the Class Period, Lumen launched a "digital transformation" initiative as it pivoted from its legacy copper network to fiber optic technology, and, accordingly, enhanced its ESG disclosures to align with, and support, its new public image.  Throughout the Class Period, these disclosures (i) repeatedly represented that Lumen made choices to reduce its impact on the environment (¶¶305, 321, 324, 328, 333-34); (ii) specified, without qualification, that Lumen "recycles telecommunications equipment" upon retirement, including, in particular, its "copper wire" (¶¶307, 315, 317, 322, 329, 331); and (iii) stressed that Lumen was focused on corporate citizenship (¶¶309, 312-13, 319, 334).  ROA.572-79.

These statements could not be further from the truth.  Far from "recycling" the lead-coated cables in its copper network upon retirement, Lumen simply vacated them across the country—unlike the other lead generated in its operations—because the cost to safely remove them was unappealing.  ROA.498-500 ¶¶115-23, ROA.598-600 ¶¶382-87.  As detailed in the FAC, this highly toxic hardware sits not only in underground conduit but lies exposed overhead in densely populated cities and public waterways, including the communities Lumen serves.  ROA.498 ¶116.

Nevertheless, the district court held that the representations in (i) were not false or misleading by drawing on its foundational finding that Lumen "had reasonable grounds to believe (and still does) that leaving the lead-sheathed cables

26

where they lay has less of an impact on the environment" than removing them. ROA.2471. With respect to (ii), the district court reasoned that "Lumen did not represent that it was recycling *all* of its copper wire." ROA.2472, ROA.2475-78. Finally, the district court discounted the statements in (i) and (iii) as "non-actionable corporate cheerleading, puffery, or vague statements of optimism." ROA.2471, ROA.2473-74, ROA.2477, ROA.2481.[3] These conclusions are clearly erroneous.

*First*, the conclusion that Lumen believed it was safer to abandon rather than remove lead cables represents an impermissible finding of heavily disputed fact. As explained above (pp.23-24), this conclusion rests on a lone statement in one of the *WSJ* articles about what "[s]ome former telecom executives" believed "at times," given the risk that lead could be disturbed during removal. ROA.539 ¶218. But the fact that lead can be released using standard removal procedures hardly means that abandonment is the safest option. Plaintiffs submit—and are prepared to amend to so allege if necessary—that any potential for disturbing lead particles can be controlled using specialized, but costly, protocols. For example, a presentation made by a lead expert from AT&T suggested installing plastic sheeting to collect any such debris. ROA.504-06 ¶136. The corresponding presentation, filed by Defendants,

---

[3] The Report found that the statements in FAC ¶¶321, 324, 328, and 333-34 from category (1) were inactionable for the reasons stated in response to statements from categories (2) and (3). ROA.2477-81. However, these statements are substantially similar in substance to FAC ¶305, and, thus, analyzed together with it.

outlines a variety of measures to prevent the spread of lead particles during removal. ROA.1548-95.  Defendants even submitted an employee manual from 1979 with a series of specialized protocols designed to do just that.  ROA.1607-19.  In fact, that Lumen itself admittedly "developed a replacement process" to "remove lead sheathed cable" when necessary.  ROA.495 ¶110.  But the district court deprived Plaintiffs of the ability to submit any proof on that score by predetermining the issue in Defendants' favor.[4]

Even if they were not literally false, the statements in category (ii) are alleged to omit critical information that made them misleading.  Here too the district court's sweeping and unsupported conclusion about what *Lumen* believed is irrelevant. Whether a statement is misleading is assessed from the standpoint of a "reasonable investor."  *Omnicare*, 575 U.S. at 186.  The FAC makes clear that—irrespective of what Lumen thought—no reasonable investor understood these statements to mean that Lumen was actively discarding thousands of miles of regulated waste across the country in a manner contrary to the RCRA.  ROA.572 ¶306, ROA.576 ¶323, ROA.577 ¶325, ROA.578 ¶330, ROA.579 ¶335.  Any argument to the contrary

---

[4] Nor is the district court's conclusion supported by the fact that the EPA has not "taken a definitive stance on the matter."  ROA.2440.  As pled, the EPA has since decided to move forward with the second phase of a multi-step Superfund review after its initial environmental testing, strongly suggesting the decision to abandon in place was not proper.  ROA.551 ¶242.

raises an issue of fact that cannot be resolved on a motion to dismiss. *Isquith v. Middle S. Util., Inc.*, 847 F.2d 186, 208 (5th Cir. 1988) ("whether information has been adequately disclosed" to a reasonable investor is "a question for a jury").

*Second*, it is inapposite that the statements in category (ii) do not specify that *all* copper wire was recycled. Nor do they specify that only *some* was recycled. Contrary to the district court's conclusion, the choice to "boast sweepingly does not operate to truncate [the] duty to disclose" but, rather, "extends it." *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *7 (S.D. Cal. June 20, 2024). Indeed, once Lumen chose to speak on the topic of how it disposes retired copper wireline, it was required to disclose a "mix of information" on that topic—both good and bad—that is not misleading. *Six Flags*, 58 F.4th at 217. As pled (ROA.573 ¶308, ROA.574 ¶316, ROA.575 ¶318, ROA.576 ¶323, ROA.578 ¶330), the detailed disclosures on the steps Lumen took to recycle retired copper gave comfort that it was at least *attempting* to do so. No reasonable investor read them to mean that Lumen *chose* to liter thousands of miles of copper cables, much less cables wrapped in hazardous waste, across the country rather than recycle it. This is particularly true given the accompanying representation that Lumen's programs are designed to "ensure the appropriate disposition of hazardous waste" (ROA.574 ¶315, ROA.575 ¶317, ROA.576 ¶322, ROA.577 ¶329). *See In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779,

at *14 (S.D. Tex. May 31, 2016) (surrounding disclosures are "critical" to determining how a reasonable investor would "take" alleged misstatements).

*Third*, the district court erroneously labeled the statements in categories (i) and (iii) as nonactionable "puffery," *i.e.*, statements that are so vague they are deemed "immaterial" as a matter of law. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). Information is material if there is a "substantial likelihood" a reasonable investor would consider it "important" in investing. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Because this requires a delicate "fact-specific" assessment of the inferences an investor would draw from certain facts, it is usually committed to "the trier of fact." *SEC v. World Tree Fin., LLC*, 43 F.4th 448, 459 (5th Cir. 2022). Accordingly, a claim should not be dismissed as a matter of law for failure to plead materiality unless the omitted facts are "so obviously unimportant . . . that reasonable minds could not differ on the question of their importance." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320-21 (11th Cir. 2019) (quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)); *accord In re Sioux, Ltd. Sec. Litig.*, 914 F.2d 61, 65 (5th Cir. 1990). The district court's materiality rulings defy this standard in two ways.

As this Court has held, statements with "concrete fact[s]" cannot be dismissed as mere puffery at the pleading stage. *Lormand*, 565 F.3d at 249 n.14. Thus, information that is "objectively verifiable" is not puffery. *Carlton v. Cannon*, 184

F. Supp. 3d 428, 494 (S.D. Tex. 2016). But the repeated representations that Lumen was making choices to reduce its impact on the environment fail this litmus test, as evidenced by its affirmative decision to discard toxic waste across the country. *Cf. Rawson v. ALDI, Inc.*, 2022 WL 1556395, at *3 (N.D. Ill. May 17, 2022) (claim that product "minimizes negative impact to the environment" goes "beyond puffery").

Further, as a concept rooted in materiality, whether a statement qualifies as puffery depends heavily on "context." *Six Flags*, 58 F.4th at 220. However immaterial similar statements may be in other cases, *e.g.*, those cited by the district court, Lumen's environmental stewardship was an integral part of its effort to rebrand as a socially responsible, digital-age company and set it apart from the competition (ROA.454-55 ¶2, ROA.467-68 ¶43, ROA.471 ¶¶51-52). That this message was repeated, year after year, and prominently displayed on its website, confirms its importance. *See In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 587 (W.D. Tex. 2022) (assurance that issuer was "focusing on cybersecurity 'hygiene'" not puffery when "repeated"). In addition, Lumen's SEC filings included a risk disclosure on the "*perceived* failure to meet evolving environmental, social and governance (ESG) practices." ROA.2169. This is notable because Item 105 of Regulation S-K required that disclosure to address "the *material* factors that make an investment . . . speculative or risky." 17 C.F.R. § 229.105(a) (emphasis added). These facts preclude finding as a matter of law that the issue was so obviously

unimportant that reasonable minds could not differ as to the importance of the statements. *See BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) ("commitment" to "respecting our environment" was not puffery when "environmental incidents" identified in SEC filings as a material risk and topic discussed repeatedly in investor disclosures).

### C.    The Representations Concerning Employee Safety Were False and Misleading

Alongside many of its environmental representations, Lumen repeatedly proclaimed that it was committed to providing a workplace free from hazards and, as such, regularly reviewed "safety performance" to identify areas for improvement. ROA.567-71 ¶¶284-304.  The performance review disclosures also provided that Lumen did so by incorporating "risk-based thinking" into its policies.  ROA.567-68 ¶286, ROA.568 ¶291, ROA.569 ¶296, ROA.570 ¶299.  However, Lumen had no system in place to check if employees who worked with lead—a task with fatal risks—followed the perfunctory protocols it had for them, much less evaluate performance to improve them.  ROA.567 ¶285, ROA.568 ¶288, ROA.568 ¶290, ROA.569 ¶292, ROA.569 ¶295, ROA.570 ¶298, ROA.571 ¶301, ROA.571 ¶304. Indeed, field workers were never even told when jobs involved lead and reported that there was rampant non-compliance with the OSHA Lead Standard.  ROA.483-84 ¶¶80-81, ROA.496-98 ¶¶113-14.

The district court ruled that (1) all these statements comprise immaterial puffery and (2) those that reference risk-based thinking were neither false nor misleading because they were "consistent with certain allegations in the FAC that there was a reasonable basis for the Company to believe that leaving the cables in place would reduce further exposure to workers." ROA.2462-70. Here too the district court erred.

These statements are not puffery for the same reasons stated above. The claim that Lumen performed regular reviews of safety performance is a far cry from the type of vague corporate cheerleading deemed immaterial as a matter of law. On the contrary, it is readily subject to objective verification and, as such, actionable. *See SolarWinds*, 595 F. Supp. 3d at 587 (claim that issuer maintained written security policy conveys specific fact and, thus, not puffery); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 393 (S.D.N.Y. 2022) (same for assertions of "ongoing monitoring and regular review" of compliance protocols). Similarly, Lumen's pledge to employee well-being was a key pillar of its new corporate image and, like the environmental disclosures, they became material through "repetition." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 759 (S.D. Tex. 2012); *see also Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 218 (E.D. Pa. 2021) (defendants made subject material by repeatedly "tout[ing] their commitment to and prioritization of safety").

In addition, Lumen's decision to abandon cable at the end of its life is *untethered* to the "risk-based" policy statements regarding safety monitoring. Once a lead cable is abandoned, it becomes obsolete, and employees cease performing work on it. ROA.498 ¶116. Employees perform work on the lead cables remaining in Lumen's legacy network *prior to retirement* and, thus, abandonment. ROA.493-97 ¶¶106-13. Accordingly, whether abandoning lead cables in place was justifiable (and it was not), it was misleading, if not false, to suggest that Lumen regularly reviewed risk-based activities, like working with a fatal neurotoxin, when it did not. *See SolarWinds*, 595 F. Supp. 3d at 585, 588 (falsity of policy statement established through CW testimony confirming lack of training and no enforcement of policies).

### D.    The Representations Concerning GAAP Compliance Were False and Misleading

In each periodic report that Lumen filed with the SEC before August 1, 2023, Defendants represented that the financial statements contained therein were prepared in accordance with GAAP. ROA.583-85 ¶¶347-50. But none reported a "loss contingency" for the sprawling web of unused toxic cables that Lumen littered across the country, as required by ASC 450. ROA.553-54 ¶¶246-51, ROA.583-85 ¶¶347-50. As such, they are "presumed to be misleading" under SEC Regulation S-X. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 249 (5th Cir. 2003). Lumen eventually made this disclosure on August 1, 2023, once the *WSJ* revealed the true facts. ROA.591-92 ¶366.

The district court erroneously held that Lumen was not required to disclose a loss contingency for its abandoned lead cables in those filings because ASC 450 only requires disclosure of a loss contingency for an unasserted claim when such a claim is "probable," and, further to its foundational finding, there was no reason to believe any claims would be asserted until the *WSJ* published its stories. ROA.2483-85.

As explained above, the district court's finding rests a tortured reading of the FAC contradicted by the facts pled therein. Indeed, the *WSJ* articles did not reveal any facts that Lumen did not *already* know. *See Godinez v. Alere Inc.*, 272 F. Supp. 3d 201, 216 (D. Mass. 2017) (failure to disclose unasserted loss under ASC 450 actionable when "the circumstances giving rise to the voluntary [product] withdrawal . . . existed" before disclosure was made). In addition, the decision to abandon lead was inconsistent with the specialized protocols that Lumen used to dispose of spent lead generated in its other operations and, thus, inconsistent with the RCRA, which is enforced by the EPA. ROA.487-88, ¶¶88-90, ROA.523-25 ¶¶174-81. On a motion to dismiss, that is more than enough to meet the "probable" standard of ASC 450.

### E. The Representations Concerning EHS Contingencies Were False and Misleading

In SEC filings, Defendants repeatedly stated that Lumen's disposal of hazardous waste "could" expose it to claims that it violated environmental or safety regulations but made no mention of the fact that this risk was very real for Lumen

and, in fact, beginning to materialize.  ROA.555-56 ¶¶253-55.  Other disclosures incorporating this language were similarly misleading.  ROA.557-58 ¶¶256-59.

In rejecting these allegations, the district court reasoned that (i) it is not "clear" that the disclosure refers to lead-sheathed cables; (ii) the disclosure warned of the very risk that existed; and (iii) a company has no duty to charge itself with unadjudicated wrongdoing.  ROA.2443-45.  Not so.

By its terms, the disclosure addresses Lumen's disposal of "hazardous . . . wastes," a term that includes all forms of lead.  ROA.487-88 ¶¶88-89, ROA.580 ¶339.  It is inapposite that this disclosure also refers to "manufacturing businesses" from prior decades.  ROA.2443.  That mid-disclosure reference is an *example* of the circumstances that had previously given rise claimed regulatory violations, which in no way changes the overall subject of the disclosure, *i.e.*, Lumen's disposal of "hazardous waste."

Nor did the disclosure accurately describe the existing risk.  Warning of a "potential risk" in the abstract "implies that no such problems [are] on the horizon." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015).  Thus, warning an event "could" occur is misleading if it has already "materialized" or likely will. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021); *see also Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018) ("generic warning" of risk will mislead when "undisclosed facts on the ground would substantially affect a

36

reasonable investor's calculations of probability"). Indeed, this Court held long ago that "[t]o warn that the untoward may occur when the event is contingent is prudent" but "to caution that it is only possible . . . when they have already occurred is deceit." *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994).

Contrary to the district court's conclusion, this does not require Lumen to accuse itself of wrongdoing. It need only disclose the "specific" facts giving rise to the present danger that the risk was not theoretical. *Lormand*, 565 F.3d at 247; *see also In re Concho Res. Inc. Sec. Litig.*, 2023 WL 2297425, at *17 (S.D. Tex. Feb. 23, 2023) (rejecting argument that duty to disclose *facts* requires issuer to engage in "self-flagellation"), *adopted in part & rejected in part on other grounds*, 2023 WL 4146278 (S.D. Tex. June 23, 2023). Here, Lumen acknowledged for years that lead was a hazardous waste regulated by the RCRA but disposed of lead cables in a manner forbidden by it. ROA.523-25 ¶¶174-81, ROA.593-94 ¶373. If actively violating a federal statute were not enough, the risk materialized no later than January 2021, when AT&T was sued under the RCRA for leaving lead cables in Lake Tahoe. ROA.530-32 ¶¶197-201. While Lumen was not a party, the complaints filed therein specified that notice was provided to the head of the EPA. *E.g.* ROA.2574, ROA.2582-91. In fact, that lawsuit was precisely what presaged the *WSJ*'s investigation and subsequent reporting. ROA.533 ¶204.

## III. THE DISTRICT COURT ERRONEOUSLY HELD THAT THE FAC FAILED TO RAISE A STRONG INFERENCE OF SCIENTER

Scienter is a state of mind embracing "intent to deceive, manipulate, or defraud" as well as "severe recklessness." *Lormand*, 565 F.3d at 251. Severe recklessness arises when there is "a danger of misleading buyers or sellers which is either known . . . or is so obvious that the defendant must have been aware." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). Thus, scienter exists when defendants are "aware of facts that . . . render [their] statements misleading." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 430 (5th Cir. 2019); *see also Aldridge*, 284 F.3d at 83 (publishing statements "when [defendants] knew facts suggesting the statements were inaccurate or misleadingly incomplete" is "classic evidence of scienter"). Whether defendants "actually believed" their misstatements is "irrelevant." *Spitzberg*, 758 F.3d at 686.

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u–4(b)(2). To qualify as "strong," the inference of scienter must be "cogent and at least as compelling as any opposing inference" drawn from the facts alleged. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). The test is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference . . . not whether any individual allegation, scrutinized in isolation" does so. *Id.* at 323. Importantly, the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the

'most plausible.'" *Id.* at 323.  In other words, "a tie" among competing inferences "favors the plaintiff." *Six Flags*, 58 F.4th at 214.

As explained herein, Plaintiffs exceed this standard by pleading an array of contemporaneous facts that, individually and in concert, raise an overwhelming inference of scienter for each Individual Defendant and, thus, Lumen.  Nevertheless, the district court ruled that (1) *no one* can be liable for the EHS risks statements in Lumen SEC filings because they are not "attributed" to any Individual Defendant; and (2) the FAC otherwise fails to raise a strong inference of scienter for any of the Individual Defendants.  Here too the district court erred.

## A.    The EHS Risk Disclosures Are Not Unattributed

As an initial matter, the district court's conclusion that the EHS risk statements—made in Lumen's quarterly and annal SEC filings between November 2018 and November 2020 (ROA.555-56 ¶¶253-54, ROA.557 ¶256, ROA.557-58 ¶258)—are not attributed to any party is mystifying.  ROA.2446.  Plaintiffs expressly allege that Lumen's 2018 Form 10-K and 2019 Form 10-K were signed by Storey and Dev.  ROA.557 ¶256, ROA.557-58 ¶258.  Further, Storey and Dev signed certifications required by the Sarbanes-Oxley Act of 2002 ("SOX") for the remaining quarterly reports that vouchsafed their reliability.  ROA.607 ¶411.

### B.     The FAC Raises a Strong Inference of Scienter for Each of the Individual Defendants

"Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence." *Nathenson v. Zonagen Inc.*, 267 F.3d 400 410 (5th Cir. 2001).  Because "[t]he PSLRA neither mandated nor prohibited *any* particular method of establishing a strong inference of scienter" any competent form of "circumstantial evidence" can support such an inference.  *Id.* at 411.  Indeed, there is no need to plead direct evidence of scienter because circumstantial evidence alone will "suffice." *Goldstein*, 340 F.3d at 246.

In the FAC, Plaintiffs alleged (1) individualized evidence of scienter specific to each Defendant; (2) Lumen's copper network, and its retirement, was core to its business; and (3) compelling individualized motives.  However, the district court incorrectly disregarded the individualized facts and improperly failed to give any weight to the remaining facts and, thus, consider them collectively with all others.

### 1.     The District Court Improperly Disregarded an Array of Individualized Facts from Which to Infer Scienter

Proceeding from its faulty premise about "who knew what and when," the district court mechanically reiterated, for nearly every misstatement, that the FAC does not allege "any facts" suggesting that the Individual Defendants acted with scienter (ROA.2442-86) and categorically disregarded the individualized allegations

40

stated therein as impermissible "must have known" allegations rejected by this Court (ROA.2446). This was error.

As the district court acknowledged (ROA.2446), this Court has held that "scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions [in] the company." *Shaw*, 537 F.3d at 535. But the allegations discarded by the district court are nothing of the sort.

For example, Storey and Dev scrutinized the economic case for upgrading Lumen's legacy network with fiber technology, which invariably analyzed the composition of, and how to retire, those assets. ROA.606 ¶408. Similarly, Stansbury reviewed the rate at which Lumen converted copper to fiber when he joined Lumen. ROA.604-05 ¶¶403-04. Dev and Stansbury's group also regularly reviewed copper retirement data to determine if those cables had any salvage value. ROA.602-03 ¶¶394-96. In addition, Johnson visited a telecom museum with a display showing that the network Lumen inherited contained lead cables. ROA.490-91 ¶97. Thus, Plaintiffs do not rely on Defendants' *executive positions* but, rather, sound circumstantial evidence from which to infer they knew about the lead cables in Lumen's legacy network and that they were abandoned in place as fiber rendered them obsolete. *See Kohut v. KBR, Inc.*, 2015 WL 11995250, at *25-26 (S.D. Tex. Sept. 3, 2015) ("personal involvement" in relevant reviews are not position-based

"must have known" allegations and support inference of scienter); *see also Masel v. Villarreal*, 924 F.3d 734, 752 (5th Cir. 2019) (similar).

The district court's categorical rejection of other allegations is even more strained. As alleged, and the district court accepted, it is "widespread public knowledge" that "lead is extremely harmful." ROA.2409. Indeed, every Individual Defendant repeatedly attested that they read forms stating so. ROA.594-98 ¶¶374-81. Further, Storey and Johnson signed certifications in connection with real estate transactions that, by law, identified lead as an environmental contaminant. ROA.595 ¶376, ROA.595-97 ¶¶378-79. These facts provide *direct evidence* that they were on notice that lead is highly toxic to humans and damaging the environment. *See In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 664 (S.D. Tex. 2021) (receipt of reports that "would have alerted [defendants]" to contrary information is meaningfully different than "must have known" position-based allegation). Indeed, it is inconceivable that anyone in these circumstances could believe discarding lead-covered cables—particularly those not in conduit—was *safe* or immune from costly scrutiny, especially given the sheer scale of the sprawl.

In addition, the fact that Lumen is subject to a DOJ investigation (ROA.547 ¶231) is another "piece of the puzzle" that the Court may properly consider as part of its holistic analysis. *Smallen v. W. Union Co.*, 950 F.3d 1297, 1308 (10th Cir. 2020); *accord Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 79 & n.58

(2d Cir. 2021). This is especially appropriate here because the investigation is focused on whether the companies who left the cables behind "had *knowledge* of the potential risks to their workers and the environment." ROA.547 ¶231.

Finally, the Individual Defendants attested in their SOX certifications that the controls they designed *ensured* that material information was provided to them for each filing. ROA.607 ¶¶411-12. Accepted as true, this further supports the inference that they were repeatedly informed that Lumen was abandoning lead cables at retirement instead of removing them like all others in the legacy network.

### 2. The Core Importance of Lumen's Copper Network Supports an Inference of Scienter

The inference that Defendants were aware of the lead cables in Lumen's legacy network, and their abandonment, is further supported by the core operations inference. As this Court has held, four non-dispositive factors may "tip the scales" in favor of inferring that a company's top executives have culpable knowledge, including: (1) a company's size; (2) if the matter at issue was "critical to the company's continued vitality"; (3) if the omitted information would be "readily apparent" to the speaker; and (4) the internal consistency of the public statements. *Six Flags*, 58 F.4th at 219. No single favor is dispositive. *Id.* While Lumen is a large company, the district court improperly eschewed the remaining factors.

For example, the district court stressed that the lead cables represent only 5% of Lumen's copper network. ROA.2487. But that unduly limits the relevant inquiry.

Throughout the Class Period, Lumen pegged its future on a "digital transformation" initiative that involved transitioning to fiber technology and containing the cost of legacy services as it did so. ROA.498 ¶115, ROA.598 ¶382.  By 2023, Lumen's legacy network still accounted for *more than 50%* of its revenues and, as such, was among its "most critical assets."  ROA.605-606 ¶¶406-07.  Thus, what Lumen chose to do with discontinued copper plant—which had significant salvage value (ROA.602-03 ¶396)—would be of great interest to any executive during the Class Period.  *See Six Flags*, 58 F.4th at 219 (problems at China parks representing 3% of revenue likely known by executives when international licensing was "an important aspect of future growth"); *Concho*, 2023 WL 2297425, at *20-21 (importance of "transition" to new business strategy for future growth supports inference).

Similarly, the district court disregarded that these facts were "readily apparent."  As pled, (i) Storey and Dev decided to transition from copper to fiber after completing a detailed strategic review of Lumen's copper assets (ROA.606 ¶408); (ii) the accounting group, headed by Dev and Stansbury, routinely reviewed copper retirement data to assess if those cables had any salvage value (ROA.602-03 ¶¶394-96); and (iii) Stansbury spent at least a month studying the rate at which copper converted to fiber upon joining Lumen (ROA.604-605 ¶404).  Reviews of this type "imply[] they knew details" on those topics. *Six Flags*, F.4th at 219.

Finally, the district court failed to appreciate that Lumen made conflicting public statements. For example, the representations that it "recycles" copper on retirement and properly disposes of "hazardous waste" are contradicted by the later admission that Lumen still had some 35,000 miles of lead (a hazardous waste) remaining in its nationwide legacy network. ROA.495 ¶111, ROA.572 ¶307.

### 3. Defendants Were Highly Motivated to Hide the Fraud

While a motive to defraud is *not* required to raise a strong inference of scienter, *Spitzberg*, 758 F.3d at 685, this form of circumstantial evidence can "meaningfully enhance" the inference. *Nathenson*, 267 F.3d at 412. To demonstrate motive, "plaintiffs must show concrete benefits that could be realized by one or more of the . . . nondisclosures alleged." *Six Flags*, 58 F.4th at 215. Such benefits need not be "pecuniary" in nature. *Id.* at 218. Here, the staggering cost to clean up the extensive amount of lead remaining in Lumen's nationwide legacy network (~$23 billion) provided ample motive to conceal this thorny topic. ROA.598-99 ¶¶382-87. That motive is reinforced by Defendants' repeated pledge to reduce costs in "legacy services" as Lumen invested substantial capital into fiber. ROA.589-99 ¶¶382-87.

The first is not, as the district court held, a generic motive "universal to [all] corporations." ROA.2488. Unlike the routine corporate events in the cases it cited, hardly any corporation faces a nationwide environmental liability of its own making, much less endeavors to *hide* it from the public. Further, a motive—even a common

one—is not generic when it is "more than routine" for the company. *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017). Thus, courts have sustained the motive to "avoid a . . . write-down which would have erased the Company's entire annual profit." *Hall v. Rent-A-Center, Inc.*, 2017 WL 6379334, at *12 n.8 (E.D. Tex. Dec. 14, 2017). Given the sheer scope of this issue, the cleanup costs here eclipsed Lumen's annual revenue (ROA.1892-93), much less profit. In addition, the second motive is no different than the motive to "save face" on earlier representations. *Six Flags*, 58 F.4th at 218; *see also Spitzberg*, 758 F.3d at 686 ("pressure" to "substantiate" prior statements supported scienter).

This error is compounded by the district court's related ruling that there are not "any facts to suggest that any individual Defendant was aware of a potential need to remove lead-sheathed cables." ROA.2488-89. Whether or not there was a need (and there was), Defendants were motivated to avoid making Lumen's widescale abandonment of lead—a known toxin—*public*. Indeed, the disclosure of this information led analysts to estimate it could cost Lumen *billions* to clean up the cables, and triggered a series of damaging events, including a civil investigation by the DOJ and a multi-stage Superfund review by the EPA, both of which remain ongoing. ROA.545-48 ¶¶227-233, ROA.588 ¶357, ROA.599-600 ¶¶384-87. Lumen has also been embroiled in a class action filed on behalf of all property

owners in Louisiana affected by lead cables. *See Blum v. AT&T Corp.*, No. 6:23-cv-01748 (W.D. La.).

### C.    The FAC Raises a Strong Inference of Scienter for Lumen

Having determined that Plaintiffs pled no facts supporting a strong inference that any Individual Defendant made a misstatement with scienter, the district court concluded that they failed to plead scienter for Lumen too.  ROA.2446-47.  But this fails to consider that the FAC pleads an array of facts from which to infer Lumen's scienter even if the allegations against the Individual Defendants fall short.

Here, Lumen itself told Washington regulators that "[o]ur technicians  . . . perform work on lead casings."  ROA.510 ¶167.  Lumen itself entered a settlement with OSHA to update its noncompliant policies for working with lead because it "understood the seriousness of the issue."  ROA.514 ¶154, ROA.515 ¶158.  Lumen itself reported every stretch of copper cable that it retired to the FCC.  ROA.526-27 ¶¶182-87.  And Lumen itself reported the spent lead handled at its facilities to the federal government as a RCRA-regulated hazardous waste.  ROA.525 ¶¶180-81.

To be sure, this Court has instructed that scienter for a corporate defendant should be determined by looking to the state of mind of the individual who made, issued, or approved a statement rather than "the collective knowledge of all [other] employees."  *Southland*, 365 F.3d at 366.  But holding Lumen liable under these circumstances is not inconsistent with *Southland*.  Many misstatements were made

*by Lumen* (ROA.555-58 ¶¶253-59, ROA.561-62 ¶¶268-70, ROA.566-68 ¶¶282-88, ROA.568-79 ¶¶291-335, ROA.583-85 ¶¶347-50) and the admissions above were made *by Lumen*. Thus, there is no need to resort to the knowledge of other defendants who joined in those statements.

Were the Court to hold otherwise, companies would have broad license to make statements to investors inconsistent with what they formally tell the government—a result that cannot be squared with the remedial policies that undergird the federal securities laws. *See Basic*, 485 U.S. at 234 (purpose of Exchange Act is to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry")); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (admissions in government filings that contradict public statement "strengthen[s]" inference that "IPaxess intended to deceive").

### D.    Viewed Holistically, the Inference of Scienter Is Overwhelming

Having already predetermined at the outset that Lumen's executives had good reason to abandon toxic lead cables across the United States until the *WSJ* revealed the cables as a source of contamination, the district court decided that there were no facts supporting the inference that Defendants knew any of their statements were potentially false or misleading and, instead, faulted Plaintiffs for asserted impermissible "fraud by hindsight." ROA.2491. But as explained above, that

sweeping conclusion does great injustice to the contemporaneous facts set forth in the FAC.  Viewed together, those facts all support the commonsense inference that Defendants knew about the cables and their dangers but chose to leave them in place as a cost cutting measure as Lumen invested heavily in fiber and hid those facts from all stakeholders—investors, regulators, and the public at large—to avoid exposing a major liability.  Thus, there is no competing innocent inference for why Defendants concealed these facts and made representations to the contrary publicly.

## IV.    THE DISTRICT COURT IMPROPERLY HELD LOSS CAUSATION WAS NOT ADEQUATELY PLED FOR SEVERAL MISSTATEMENTS

Loss causation refers to the "causal connection" between the misrepresentations and plaintiffs' losses.  *Dura*, 544 U.S. at 342.  Because it is not subject to any special pleading rules, *alleging* loss causation is "not meant to impose a great burden." *Id.* at 347.  Consistent with Rule 8, a plaintiff need only allege that the stock price "depreciate[d]" after some "relevant truth" concealed by the fraud became known.  *Amedisys*, 769 F.3d at 321.  As such, it is well-settled that the truth can leak out "in a series of partial disclosures." *Lormand*, 565 F.3d at 261 & n.31; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (disclosure need only "reflect part of the . . . truth obscured by the fraud[]").

Plaintiffs allege that Lumen's stock price fell in direct response to eight partial disclosures between July and October 2023, which revealed that (1) Lumen inherited an extensive amount of lead-covered copper cables in its legacy network; (2) Lumen

chose to abandon those cables as they became obsolete, estimated to require billions in clean up; (3) workers who were exposed to those cables had unsafe levels of blood lead levels; (4) lawmakers and regulators initiated investigations in response thereto; and (5) those cables gave rise to a risk of loss that it was required to disclose to investors but never previously did.  ROA.585-92 ¶¶351-69, ROA.608-09 ¶¶414-18.

The district court purported to limit its analysis to whether the FAC adequately alleged misstatements and scienter.  ROA.2442, ROA.2489.  Nevertheless, it expressly justified dismissing claims arising from two groups of misstatements on loss causation grounds.  As explained below, these rulings are directly contrary to controlling law and incompatible with the FAC's well-pled allegations.

*First*, the district court held that loss causation was lacking for the employee safety statements because the FAC does not allege that "there was a public disclosure regarding these alleged practices" from the Class Period and "until the fraud is disclosed, defendants cannot be held liable for a decline in the stock price." ROA.2463-64, ROA.2467.[5]  But it is firmly established that a corrective disclosure need not "mirror an earlier misrepresentation" or "reveal that [it] was fraudulent." *Flowserve*, 572 F.3d at 230-31.  Rather, the relevant test is whether it reveals a new fact that "make[s] the existence of the actionable fraud more probable." *Amedisys*,

---

[5] The district court provided this ruling in response to FAC ¶284 and ¶294, but applied the analysis to every other employee safety statement.  ROA.2462-70.

769 F.3d at 321. Here, the *WSJ* revealed that (1) telecom companies had known for decades that their workers were exposed to unsafe levels of lead; and (2) Lumen received nine citations from OSHA for failing to provide employees who worked with lead adequate training and protection. ROA.542-43 ¶220. In fact, one article concluded from Lumen's citations that workers "still face[] exposure to lead in the modern era." *Id.* Taken together, these facts certainly make the alleged fraud more probable, especially under the notice pleading standard that applies here.

*Second*, the district court held that loss causation was lacking for statements representing that Lumen recycled its retired copper wires because "there is no indication, and certainly no public disclosure, that Lumen was not recycling non-lead-sheathed copper." ROA.2472.[6] But the fraud here does not arise from copper wires *without* lead casing. To the contrary, Lumen is alleged to defraud investors by failing to disclose that it was not recycling its copper wires that were *covered* in lead. ROA.572 ¶306. And the *WSJ* articles revealed that the telecom companies which succeeded the Bell System, necessarily including Lumen, had abandoned— and, thus, not recycled—such cables across the country. ROA.585-92 ¶¶351-69.

---

[6] Here too the district court made this holding in response to FAC ¶307 but expressly applied its analysis to FAC ¶307 to FAC ¶¶315, 317, 321-22, 328-29, and 331. ROA.2472-73, ROA.2475-80.

## V.    THE DISTRICT COURT INCORRECTLY DISMISSED PLAINTIFFS' CONTROL PERSON CLAIM

Because Plaintiffs stated a primary violation, this Court should reverse the district court's dismissal of Plaintiffs' Section 20(a) claim. *Six Flags*, F.4th at 221.

## VI.    PLAINTIFFS SHOULD BE PERMITTED TO AMEND

The liberal standard for amendment "favors leave as a necessary companion to notice pleading and discovery." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 283 F.3d 363, 367 (5th Cir. 2001). Accordingly, an initial dismissal for failure to state a claim should be *without* prejudice "unless it is clear that the defects are incurable." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Thus, district courts should "afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case" for good. *Id.*

Plaintiffs specifically requested that, if necessary, any dismissal be without prejudice so they could at least move for leave to address the pleading defects identified by the Magistrate Judge. ROA.2538-39. Without any explanation, the district court dismissed the case with prejudice and entered Judgment in favor of Defendants less than one business day after Plaintiffs filed their Objections to the Magistrate's Report, before Defendants even filed any response thereto. ROA.2599. The decision to do so was an abuse of discretion for three reasons.

*First*, the pleading defects are curable. As explained above, the decision to dismiss primarily arose from a lack of *sufficient facts*, as opposed to some fixed rule

of law.  For example, many misstatements were dismissed based on the notion that the FAC concedes that Lumen had a reasonable basis to believe it was safe to retire lead cables in place.  As Plaintiffs informed the district court (ROA.2539), they could overcome that defect by specifying that there was reason to believe it was *not* safe to do so.  Similarly, the failure to plead facts that raise a strong inference of scienter can self-evidently be remedied by pleading additional facts that do, including, for example, that Defendants were informed that lead cables were left in place, rather than removed, and/or that doing so could trigger various forms of regulatory enforcement or litigation.  Indeed, Plaintiffs represented that they were prepared to amend to allege that Defendants' outsized incentive compensation provided them with motive to defraud if the existing allegations were insufficient (ROA.2136).  *See Six Flags*, 58 F.3d at 215 (performance-based compensation can establish proper motive when the bonus is "extremely high").  The decision to dismiss with prejudice was therefore improper.  *See AAPSEF*, 103 F.4th at 394 (reversing dismissal with prejudice because plaintiffs should have the opportunity to amend "especially" when it appears they can "replead to satisfy the 12(b) standard").

*Second*, Plaintiffs should not be penalized for failing to state a claim because this case is subject to the heightened pleading requirements of the PSLRA, and they have had no previous opportunities to cure.  This Court has emphasized that the failure to satisfy heightened pleading requirements, like those imposed by Fed. R.

Civ. P. 9(b), "should not automatically or inflexib[ly] result in dismissal of the complaint with prejudice . . . unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000). As stated above, the defects here are not incurable. Further, the Judgment entered below was the *first* time the district court passed on the sufficiency of Plaintiffs' allegations. Thus, Plaintiffs have not had *any* previous opportunities to address the pleading defects. Depriving Plaintiffs of that opportunity, and the ability to satisfy the demanding requirements of the PSLRA, is an abuse of discretion. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (reversing dismissal with prejudice as abuse of discretion because the PSLRA requires "an unprecedented degree of specificity"); *In re Pilgrim's Pride Corp. Sec. Litig.*, 2010 WL 3257369, at *28 (E.D. Tex. Aug. 17, 2010) (declining to dismiss PSLRA case with prejudice because "[t]his is certainly not a case where Plaintiffs have been given multiple chances to correct pleading deficiencies and have failed to do so").

*Third*, the district court did not provide *any* explanation for denying Plaintiffs' request to dismiss without prejudice. This Court has emphasized that "a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal." *N. Cypress Med. Ctr.*, 898 F.3d at 478; *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (refusing to grant leave to amend "without any

justifying reason" is "not an exercise of discretion" but "an abuse of that discretion"). The district court's failure to provide any explanation under the circumstances described above highlights the need to reverse the decision below. *Id.*; *see also AAPSEF*, 103 F.4th at 395 (decision to dismiss with prejudice when defects could be cured was abuse of discretion "particularly" when district court "did not give any explicit, much less meaningful, explanation" for doing so).

## <u>CONCLUSION</u>

The Judgment dismissing all claims in the FAC with prejudice should be reversed in its entirety. Alternatively, the Court should vacate the Judgment, modify the dismissal to be without prejudice, and remand for further proceedings.

DATED: July 14, 2025                    Respectfully submitted,

 /s/ *Justin D. D'Aloia*

Jeremy A. Lieberman
Justin D. D'Aloia
Guy Yedwab
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, New York 10016
T: (212) 661-1100
F: (917) 463-1044
jdaloia@pomlaw.com
jalieberman@pomlaw.com
gyedwab@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

Brian Schall
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Christine Glauber*

Eric J. O'Bell
O'BELL LAW FIRM, LLC
3500 North Hullen Street
Metairie, Louisiana  70002
(504) 456-8677
ejo@obelllawfirm.com

*Counsel for Plaintiffs and Liaison Counsel for the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 14th day of July, 2025, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service was accomplished via that system on the following registered CM/ECF users:

Claire E. Juneau
Jeffrey J. Gelpi
KEAN MILLER LL
P909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone: (504) 585-3050
claire.juneau@keanmiller.com
jeffrey.gelpi@keanmiller.com

Lyle Roberts
George Anhang
Lauren Beebe
ALLEN OVERY SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Telephone: (202) 508-8108
lyle.roberts@aoshearman.com
george.anhang@aoshearman.com
lauren.beebe@aoshearman.com

Katherine Mallory Tosch Hoggatt
ALLEN OVERY SHEARMAN STERLING US LLP
800 Capitol Street, Suite 2200
Houston, TX 77002
Telephone: (713) 354-4900
mallory.toschhoggatt@aoshearman.com

*Counsel for Defendants-Appellees*

/s/ Justin D. D'Aloia
Justin D. D'Aloia

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,000 words, as determined by the word-count function of Microsoft Office 365 Version 2408, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, and inclusive of footnotes.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Times New Roman font.

I further certify that, in the foregoing brief filed using the Fifth Circuit CM/ECF document filing system, (1) the privacy redactions required by Fifth Circuit Rule 25.213 have been made; (2) the electronic submission is an exact copy of the paper document; and (3) the document has been scanned for viruses with the most recent version of AVG Internet Business Edition and is free of viruses.


*/s/ Justin D. D'Aloia*
Justin D. D'Aloia